**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STEVEN M. PERNA, as the administrator of the Estate of Matthew Perna, deceased,
*Address Filed under Seal*

Plaintiff,

-against-

UNITED STATES OF AMERICA;
*c/o U.S. Attorney's Office, District of Columbia,*
*950 Pennsylvania Avenue, NW Washington, DC 20530*

MERRICK GARLAND, individually,
*c/o Arnold & Porter 601 Massachusetts Ave, NW*
*Washington, DC 20001-3743*

MATTHEW GRAVES, individually,
*c/o Winston Taylor LLP, 1901 L Street NW,*
*Washington, DC 20036*

and

JOHN DOES 1-25, officials of the United States Department of Justice, individually
*57 Pennsylvania Ave, NW, The Mall, DC 20530*

Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff STEVEN M. PERNA, as administrator of the Estate of Matthew Perna, deceased, ("Plaintiff") by and through his attorneys, Raiser, Kenniff & Lonstein, P.C. brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. Matthew Perna (hereinafter, "Matthew") was 37 years old when he made the tragic decision to end his own life. This decision came after more than a year after relentless prosecution of Matthew by the United States government for Matthew's presence and actions at the political rally and protest at the United States Capitol on January 6th, 2021. As soon as Matthew learned that he was a person of interest in the Government's January 6th investigation, he immediately contacted federal authorities, voluntarily met with investigators, answered their questions, and fully cooperated with the investigation. Once the prosecution commenced, Matthew quickly pled guilty to all charges against him in an attempt to bring the criminal action to a prompt resolution. But the government, unsatisfied with this result, communicated to Matthew that they intended to seek a sentencing enhancement of domestic terrorism that could result in Matthew spending years in prison. The government made these threats despite knowing of Matthew's depression, anxiety, and suidical ideation.

2. This is a civil action for damages arising from Defendants' violations of Matthew's rights under the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

3. Matthew was targeted, arrested, prosecuted, and punished because of his constitutionally protected expressive and associational activity as a member of the protesters who gathered on Capitol on January 6th, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021, will be referred to as the "January

6th Defendants"). He was subjected to malicious and retaliatory prosecution and threatened with enhanced sentencing, despite the government knowing that Matthew's depression, anxiety, and risk of self-harm was specifically tied to Matthew's uncertainty regarding the resolution of the criminal case against him. Overwhelmed with the government's prosecution of him, Plaintiff made the tragic decision to end his life on February 25, 2022.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

5. Jurisdiction over Matthew's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

6. Jurisdiction over Matthew's claims against defendant UNITED STATES OF AMERICA (the "United States") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because a significant amount of the acts or omissions complained of occurred in this District.

8. On or about August 11, 2025, Plaintiff transmitted three administrative Notices of Claim to the United States Department of Justice ("DOJ") asserting claims arising from Matthew's mistreatment and eventual wrongful death, and demanding a sum certain.

9. As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

## PARTIES

10. Administrator Steven M. Perna is the brother of Matthew Perna, deceased.

11. Prior to his death, Matthew was a citizen and resident of Mercer County, State of Pennsylvania.

12. On or about May 26, 2026, Steven M. Perna was appointed by the Register of Will of Mercer County, Pennsylvania as the Administrator of the Estate of Matthew Perna, deceased.

13. Steven M. Perna brings this action solely in his representative capacity as the duly appointed Administrator of the Estate of Matthew Perna, deceased. Pursuant to Pennsylvania law, Steven M. Perna is authorized to investigate, prosecute, settle, and maintain causes of action belonging to the Estate of Matthew Perna and to pursue all survival, wrongful-death, and related claims arising from the injuries and death alleged herein.

14. Defendant UNITED STATES OF AMERICA ("United States") is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

15. Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

16. Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

17. Defendants JOHN DOES 1-25 ("John Does 1-25") are federal United States Department of Justice officers and supervisors whose identities are presently unknown and will be substituted upon discovery.

## **FACTUAL ALLEGATIONS**

18. Plaintiff Matthew Perna was known to his family, friends, and community as an intelligent, compassionate, and charitable young man whose life was devoted to helping others. Matthew graduated at the top of his high school class and later graduated *cum laude* from

Pennsylvania State University. After college, he traveled to Thailand and South Korea, where he taught English to underprivileged schoolchildren and became fluent in both Thai and Korean.

19. Matthew's life changed dramatically when his mother, Veronica, was diagnosed with leukemia. When he learned of his mother's diagnosis, Matthew immediately returned to Pennsylvania to care for his mother. After her death in 2015, Matthew remained home to support his grieving family, particularly his father, Lawrence, whose health steadily declined. Inspired by his experiences caring for his mother, Matthew devoted himself to studying holistic health and nutritional therapies. He built a business promoting alkaline water filtration systems and other wellness products, frequently providing those products free of charge to individuals who could not afford them because he believed they would improve their health.

20. Matthew's commitment to serving others extended well beyond his work. He became increasingly active in his local church, participated in a humanitarian mission to Haiti, organized local yoga and running groups, and pursued photography, music, and other creative interests. His generosity extended even to strangers, and he became widely known within his community for quietly assisting people experiencing financial or personal hardship.

21. Prior to January 6th, Matthew had never been arrested, charged with a crime, or known as a violent person. He maintained close relationships with his family, served as an important source of care and support for his father following his mother's death, and looked forward to building a future with his longtime girlfriend. Those who knew Matthew regarded him not as an extremist or a dangerous individual, but as a compassionate son, devoted caregiver, successful small-business owner, and active member of his church and community.

22. By January 2021, Matthew had built a life centered on family, faith, health, and service to others. The events that followed fundamentally altered the course of that life. What

began as a single day in Washington, D.C., ultimately evolved into a criminal prosecution that, as will be further set forth below, subjected Matthew to escalating legal pressure, profound psychological distress, and ultimately the despair that led to his death.

23. On January 6th, 2021, a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

24. On that day, Matthew was present in Washington, D.C. to exercise his First Amendment rights by attending a political rally and protesting the certification of the Electoral College vote.

25. Matthew was unarmed and did not assault any law enforcement officers.

26. Matthew entered the United States Capitol through an open door and remained in the Capitol Building for less than twenty minutes.

**THE ESCALATION OF PLAINTIFF'S PROSECUTION**

27. Shortly after January 6th, Matthew learned that the FBI had identified him as a person of interest. Matthew immediately contacted federal authorities, voluntarily met with investigators, answered their questions, and fully cooperated with the investigation. Matthew made no attempt to flee, conceal evidence, or evade law enforcement.

28. By January 18, 2021, federal authorities had initiated criminal proceedings against Matthew by filing a criminal complaint under Case No. 21-cr-156 in the United States District Court for the District of Columbia. Matthew was charged with two misdemeanors arising from his presence at the United States Capitol on January 6, 2021

29. Matthew was arrested on January 19, 2021.

30. The original complaint did not charge Plaintiff with obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2), nor did it accuse Plaintiff of committing violence against

law enforcement officers, using a deadly weapon, or engaging in conduct traditionally associated with terrorism offenses.

31. Despite the limited nature of the initial charges, federal prosecutors subsequently escalated the prosecution.

32. On February 25, 2021, a federal grand jury returned an indictment adding a felony count alleging obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2), a statute originally enacted as part of the Sarbanes-Oxley Act and historically used in cases involving evidence destruction and obstruction-related misconduct.

33. The addition of the § 1512(c)(2) charge dramatically increased Matthew's potential sentencing exposure, altered the character of the prosecution, and provided the Government with substantially greater leverage in plea negotiations and sentencing proceedings.

34. At all relevant times, Matthew was a nonviolent defendant. There was no allegation that he assaulted any law enforcement officer, used any weapon, planned violence, organized violence, or caused physical injury to any person.

35. In July 2021, Matthew underwent a forensic psychological evaluation at the request of the United States.

36. The psychological evaluation concluded that Matthew suffered from depression, situation-related anxiety, feelings of worthlessness, and thoughts of suicide or self-harm on an almost daily basis. The evaluator further concluded that Matthew presented a moderate risk of self-harm, but no significant risk of current or future violent offending.

37. The evaluator specifically noted that Matthew's anxiety stemmed in substantial part from uncertainty concerning the outcome of his criminal case.

38. The evaluator also found that Matthew was fundamentally a kind person with a good heart, and was not an aggressive or hostile individual. Most importantly, the evaluator concluded that Matthew presented no significant current or future risk of violent reoffending.

39. Eager to resolve his legal trouble and take responsibility for his actions on January 6th, Matthew formally notified the Court of his intention to withdraw his prior plea of not guilty and enter a plea of guilty in November 2021.

40. On December 17, 2021, Matthew entered a guilty plea and accepted responsibility for the offenses charged against him.

41. By pleading guilty, Matthew relinquished his constitutional right to trial and spared the Government the burden and expense of further litigation.

42. Matthew reasonably believed that his prompt acceptance of responsibility would permit his case to proceed expeditiously toward sentencing and final resolution. After all, with Matthew's guilty plea, the Government no longer faced uncertainty regarding conviction or trial.

43. Accepting that incarceration was possible, Matthew began researching educational programs available within the Bureau of Prisons and hoped to use his background as a teacher to assist other inmates in obtaining their GEDs.

44. Matthew's hope for a prompt resolution of his criminal case was shattered when, following Matthew's guilty plea, representatives of the Department of Justice communicated to Matthew's defense counsel that the Government was considering terrorism-related sentencing treatment that would increase Matthew's anticipated sentence from months to years.

45. The prospect of terrorism treatment fundamentally altered Matthew's understanding of his potential punishment and created the realistic possibility that he would spend a substantial portion of his adult life incarcerated.

46. The Government's consideration of terrorism-related sentencing treatment also substantially delayed the sentencing process.

47. The ensuing uncertainty and delay considerably exacerbating Matthew's already fragile mental health, including the anxiety that the forensic evaluation had concluded was tied the outcome of his criminal case.

48. As a direct result of the Government's escalating charging and sentencing strategy, Matthew experienced increasing anxiety, hopelessness, emotional distress, and fear regarding the remainder of his life. Matthew stopped exercising, couldn't sleep, and lost interest in the wellness work that had previously defined his life.

49. Matthew became increasingly distressed not only about his own future but also about the effect his prosecution would have on his elderly father, whose health had already deteriorated following the death of Matthew's mother and who depended heavily upon Matthew for care and daily assistance.

50. As the prosecution intensified and the prospect of years in federal prison became increasingly real, Matthew's longtime romantic relationship ended under the weight of the uncertainty surrounding his future and his fiancé broke off their engagement.

51. Plaintiff committed suicide on February 25, 2022, while he was still awaiting sentencing and still facing the prospect of terrorism-based sentencing treatment.

## THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN

52. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

53. At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6 investigations and prosecutions.

54. At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6 prosecutions within the District of Columbia.

55. Throughout their respective tenures, Garland and Graves repeatedly described January 6th prosecutions as among the Department’s highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

56. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6 defendants, including Plaintiff.

57. Upon information and belief, Garland and Graves approved or ratified the Department's widespread use of 18 U.S.C. § 1512(c)(2) despite substantial judicial disagreement concerning the scope of that statute and despite knowing that the charge materially increased detention exposure, sentencing exposure, and prosecutorial leverage.

58. Throughout Matthew’s prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff’s sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that

expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

59. Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and were intended, at least in part, to maximize deterrent effect and public example-making.

**<u>AS AND FOR A FIRST CAUSE OF ACTION</u>**
*Fifth Amendment Equal Protection* – Bivens
*Federal Individual Defendants*

60. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

61. The equal protection component of the Fifth Amendment prohibits federal officials from intentionally treating similarly situated individuals differently without adequate governmental justification.

62. At all relevant times, Defendants Garland and Graves exercised supervisory authority over Department of Justice policies governing the investigation, charging, plea negotiation, sentencing, and overall treatment of January 6th Defendants.

63. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted policies and practices that subjected January 6th Defendants, including Matthew, to materially different treatment than similarly situated defendants accused of comparable nonviolent conduct.

64. Upon information and belief, January 6th Defendants were disproportionately subjected to expansive charging theories, heightened detention requests, enhanced sentencing positions, and unusually aggressive prosecutorial strategies not routinely employed against

similarly situated defendants charged with comparable offenses arising from other political demonstrations, civil disturbances, or disruptions of governmental proceedings.

65. Matthew was subjected to those policies and practices.

66. Although Matthew was initially charged with relatively limited offenses arising from his presence at the Capitol on January 6, 2021, Defendants subsequently escalated the prosecution by adding a felony obstruction charge under 18 U.S.C. § 1512(c)(2), dramatically increasing Matthew's sentencing exposure and the Government's leverage over him.

67. Following Matthew's guilty plea, Defendants further subjected Matthew to disparate treatment by evaluating, considering, and/or threatening terrorism-related sentencing treatment despite the absence of any allegation that Matthew planned, directed, organized, facilitated, or committed an act of terrorism as that term is commonly understood.

68. Upon information and belief, criminal defendants charged with comparable nonviolent obstruction, trespass, civil disorder, or protest-related offenses arising from other demonstrations were generally evaluated based upon individualized conduct rather than subjected to the expansive charging theories, terrorism-related sentencing positions, and extraordinary prosecutorial practices alleged herein.

69. Upon information and belief, Defendants' actions toward Matthew were motivated, at least in part, by his actual or perceived political associations, viewpoints, and participation in events associated with January 6.

70. Matthew lacked a sufficient governmental interest justifying the disparate treatment imposed upon Plaintiff. In the alternative, Defendants lacked any rational basis for treating Matthew differently from similarly situated defendants.

71. As a direct and proximate result of Defendants' conduct, Matthew suffered loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

72. The conduct of Defendants violated Matthew's rights under the equal protection component of the Fifth Amendment to the United States Constitution.

**AS AND FOR A SECOND CAUSE OF ACTION**
*Abuse of Process – FTCA*

73. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

74. Defendant United States, acting through its employees, agents, attorneys, supervisors, and law-enforcement personnel, utilized legal process against Matthew for purposes other than those for which such process was designed.

75. The criminal process initiated against Matthew was intended to determine criminal liability and, if appropriate, impose a lawful sentence proportionate to the conduct established by the evidence.

76. Instead, Defendants employed the criminal process to obtain collateral objectives unrelated to the fair adjudication of Matthew's alleged offenses.

77. Following January 6, 2021, the Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest and most significant criminal enforcement efforts in the history of the Department.

78. Upon information and belief, Defendants viewed January 6 prosecutions not merely as individual criminal cases but also as vehicles through which broader political, symbolic, and deterrent objectives could be achieved.

79. Upon information and belief, Defendants sought to maximize the deterrent impact of January 6 prosecutions by pursuing expansive charging theories, enhanced sentencing exposure, and public messaging designed to create examples of January 6th Defendants.

80. Matthew was among the individuals subjected to those policies and practices.

81. Defendants initially charged Matthew with relatively limited offenses arising from his presence inside the Capitol on January 6th, 2021.

82. Nevertheless, Defendants escalated Matthew's prosecution by adding a felony charge under 18 U.S.C. § 1512(c)(2), dramatically increasing Matthew's potential sentencing exposure and providing the Government with substantial additional leverage.

83. Matthew ultimately surrendered his right to trial and entered a guilty plea.

84. By entering a guilty plea, Matthew accepted responsibility for the charged conduct and eliminated the need for a contested trial. But rather than proceeding expeditiously toward sentencing and final resolution, and despite achieving every legitimate objective ordinarily associated with a criminal prosecution, Defendants continued to employ the criminal process to increase pressure upon Matthew by pursuing sentencing treatment associated with domestic terrorism.

85. Upon information and belief, at all relevant times, Defendants possessed information demonstrating that Matthew suffered from severe depression, emotional instability, and suicidal ideation.

86. Defendants knew or should have known that Matthew was uniquely vulnerable to the psychological consequences of prolonged uncertainty concerning his potential sentence.

87. Despite possessing such information, Defendants continued to utilize the possibility of terrorism treatment as leverage within the criminal process.

88. Defendants further prolonged the uncertainty surrounding Matthew's fate by delaying sentencing proceedings and extending the period during which Plaintiff remained exposed to the possibility of dramatically enhanced punishment.

89. Upon information and belief, Defendants employed these tactics not merely to obtain a lawful sentence but to increase prosecutorial leverage, create public examples, maximize deterrence, and reinforce the Department's publicly announced January 6 enforcement campaign..

90. The threat of terrorism treatment served a collateral purpose beyond the ordinary function of criminal sentencing.

91. The criminal process was thereby used as a means of coercion, intimidation, deterrence, public example-making, and psychological pressure rather than solely as a mechanism for adjudicating criminal liability.

92. Throughout Matthew's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Matthew's criminal exposure. That charging theory substantially increased Matthew's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings.

93. More than two years after Matthew's death, the Supreme Court substantially rejected the Government's interpretation of 18 U.S.C. § 1512(c)(2), undermining the principal legal theory that had supplied much of the leverage utilized against Plaintiff throughout the prosecution.

94. As a direct and proximate result of Defendants' misuse of legal process, Matthew suffered severe emotional distress, loss of liberty, reputational harm, economic damages, psychological injury, and ultimately death.

95. The actions of Defendants constituted abuse of process under applicable law.

96. As a result, Plaintiff is entitled to recover all compensatory damages permitted by law.

**AS AND FOR A THIRD CAUSE OF ACTION**

*Malicious Prosecution - FTCA*

97. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

98. Defendant the United States, by and through its employees and agents, initiated and continued criminal proceedings against Matthew by charging him under 18 U.S.C. § 1512(c)(2) in the United States District Court, District of Columbia, under Case No. 21-cr-156. These actions including swearing out affidavits, selecting the statutes under which Perna would be charged, and considering whether to request that Perna be sentenced under enhanced sentencing guidelines for domestic terrorism.

99. At the time Defendants initiated and continued the §1512(c)(2) prosecution, multiple federal judges had already questioned the Government's interpretation of the statute, substantial legal disagreement existed regarding its scope, and Defendants nevertheless continued relying upon that expansive interpretation to increase Plaintiff's sentencing exposure and prosecutorial leverage.

100. Defendant the United States, by and through its employees and agents, acted with malice by pursuing an expansive and legally unsupported obstruction theory, threatening terrorism-related sentencing treatment despite Matthew's nonviolent conduct, and continuing to escalate the prosecution after Plaintiff voluntarily accepted responsibility through a guilty plea.

101. Matthew's prosecution on the violation of 18 U.S.C. § 1512(c)(2) terminated in his favor when the Supreme Court of the United States ruled that 18 U.S.C. § 1512(c) did not apply to Plaintiff's actions on January 6th in *Fischer v. United States*, 503 U.S. 480 (2024) and *Fischer* substantially narrowed the Government's interpretation of §1512(c)(2) and undermined the legal theory that supplied the principal leverage against Matthew.

102. As a direct and proximate result of the aforementioned, Matthew suffered emotional distress, reputational harm, and economic damages, and ultimately his untimely death.

**AS AND FOR A FOURTH CAUSE OF ACTION**
*Intentional Infliction of Emotional Distress - FTCA*

103. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

104. Defendant the United States, by and through its employees and agents, engaged in extreme and outrageous conduct, including threatening to enhance Matthew's sentence with a charge of domestic terrorism despite possessing a forensic evaluation warning that Matthew experienced daily suicidal ideation directly linked to uncertainty concerning the criminal case.

105. Defendant the United States, by and through its employees and agents, acted intentionally or with reckless disregard of the high probability that their conduct would cause severe emotional distress.

106. The aforementioned conduct was the proximate cause of Matthew's injuries.

107. As a result of the aforementioned conduct, Matthew suffered severe emotional distress, including anxiety, trauma, humiliation, sleep disturbance, and fear of permanent disability or death.

**AS AND FOR A FIFTH CAUSE OF ACTION**
*Wrongful Death - FTCA*

108. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

109. Defendants had prior knowledge of, or at minimum consciously disregarded medical evidence demonstrating, the potential for Matthew to take his own life, including but not limited knowledge of Matthew's unstable mental health and his anxiety and suicidal ideation directly tied to uncertainty regarding the outcome of his criminal case.

110. The death and suicide of Matthew was caused solely by the negligence,

carelessness, willful and wanton behavior, and/or conscious indifference to the civil rights of Matthew by Defendants, their agents, servants, representatives, and or/employees, including but not limited to the excessive charging of Matthew under excessive and irrelevant criminal statutes.

111. The aforementioned actions of Defendants were the sole factor and the proximate and foreseeable cause of the suicide and ensuing death of Plaintiff's decedent Matthew.

112. As a direct and proximate result of Defendant's culpable acts described herein, Defendant caused the decedent to sustain injuries and damages including but not limited to the Matthew's wrongful death.

113. As a direct and proximate result of the negligence, carelessness, recklessness, willful and wanton behavior, and conscious indifference to the civil rights of Matthew by Defendant the United States and its agents, servants, and/or employees, and by virtue of the wrongful death of the decedent, the Estate of Matthew Perna, and the statutory beneficiaries entitled to recovery have been damaged in an amount to be determined at trial, but which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to the Plaintiff, plus post-judgment interest;
b. Awarding punitive damages to the Plaintiff;
c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and
d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: September 15, 2026
New York, New York

Respectfully submitted,
/s/*Alexander Lonstein*

Alexander Lonstein
RAISER, KENNIFF &
LONSTEIN, P.C.
99 Park Avenue, Suite 1530
New York, NY 10016
alexander@rkl.law